# CHARLESTON.

MARIE C. AMISS *et als.* v. C. TALBOTT HITESHEW

(No. 6275)

Submitted February 12, 1929.   Decided February 19, 1929.

704

*Turner & Forrer,* for appellees.
*Russell, Hiteshew & Adams,* for appellant.

HATCHER, JUDGE:

The wife of this defendant died in March, 1924, intestate, and the owner of considerable property including the house in which the two had lived. The defendant continued to occupy the house and as her administrator received the rents from the other property. This suit was brought in February, 1925, by her other heirs for the purpose of ascertaining and partitioning the intestate's property, assigning the defendant his curtesy, and for an accounting of the rents he had received. In that accounting the defendant was charged with rent for his occupancy of the mansion house prior to the assignment of curtesy. This appeal involves the correctness of that charge.

An estate by the curtesy in West Virginia was purely statutory during the period the defendant occupied the mansion house. It was made so by Chapter 73, Acts 1921 (section 15 of Chapter 65, Code 1923), which is as follows: "If a married woman die seized of an estate of inheritance in lands,

her husband shall be tenant by the curtesy in the one-third thereof. An estate by the curtesy in the lands of which a married woman may hereafter die seized, shall exist and be held by her husband therein, whether they had issue born alive during the coverture or not, in the same manner and under the same right as a widow would be entitled to dower.'' The statute is the result of the general levelling process, which the respective civil rights of man and woman have undergone in recent years. The plain object of the enactment is to place curtesy and dower on a parity. Curtesy was destroyed as it theretofore existed and reconstructed in the form and substance of dower. Note the language of the statute: ''An estate by the curtesy * * * shall exist * * * in the same manner and under the same right as the widow would be entitled to dower.'' Counsel seek a discussion of the nature of the right of dower prior to assignment, pointing to *Huddleston* v. *Miller*, 81 W. Va. 357, 358, and cases there cited. That line of decisions seems based entirely on the common law conception of dower, overlooking entirely the statutory innovations, as well as the early case of *Engle* v. *Engle*, 3 W. Va. 246, 257. That case denominates a widow prior to assignment of dower as a ''tenant in common with the heirs to the extent of her right in dower.'' (See also *Bachman* v. *Christman*, 23 Pa. St. [11 Harris] 162, 163; 19 C. J. 530-1, sec. 202, note 23.) But a classification of her legal status is not necessary in this suit. Under the enactment of 1921, whatever may be the nature of the right or estate in dower, that same right or estate exists also in curtesy. In other words, the estate of the husband in the property of his deceased wife is exactly the same as would be the estate of the wife in his property if the situation were reversed.

Section 8, Chapter 65, Code, provides ''until her dower is assigned the widow * * * may hold, occupy and enjoy the mansion house and curtilage without charge.'' The defendant says that since the widow may occupy the mansion house without charge, the widower is accorded the same benefit under the statute of 1921. The plaintiffs say this right in the widow is a special statutory privilege and is no part of the dower estate, citing 2 Minor's Institutes (4th ed.) 158.

That authority does not support plaintiffs' contention in its entirety. Therefore a review of the history of this privilege becomes pertinent. It is called by the law writers "the widow's quarantine". Some authorities state that this right did not exist at common law, but was the boon of Magna Charter (A. D. 1215) to widowhood. Minor on Real Property (2nd ed.), section 317; Thompson on Real Property, section 850-1; Washburn Real Property (6th ed.), p. 230-1; Lomax Digest, Vol. 1, Chap. 3. They have seemingly overlooked, however, important ancient authority on the subject. The first English law book was written by the Chief Justiciar, Glanville, about the year 1175 A. D. A passage therefrom relating to the rights of widows is translated as follows: "And where the husband dwelt without claim or contest, let the wife and children dwell in the same, unassailed by litigation." Beames' Glanville, p. 131, note; Ancient Laws of Eng., p. 415. Lord Coke writes: ' "But some have said that by the ancient law of England the woman should continue to hold a year in the husband's house, within which time if dower were not assigned she might recover it: and this certainly was the law of England before the Conquest." Coke's First Institutes, Vol. 1, Chap. 35, section 36 (32b). Upon the strength of these statements other authorities treat quarantine as a common law right. Am. & Eng. Ency. of Law, p. 149; Reeves on Real Property, section 463; Bacons Abridgements, 3rd Vol., p. 194-5; Scribner on Dower (2nd ed.) Vol. 2, p. 53; *Perine* v. *Perine,* 35 Ala. 644, 648; *Carnall* v. *Wilson,* 21 Ark. 62, 76 Am. Dec. 351. When we recall that Magna Charta "was no new declaration" (Proeme, Coke's Second Institutes), but "was for the most part compiled from * * * the old common law" (Introduction to the Charters, Blackstone's Law Tracts, 289), there is ample ground for the position taken by the second line of authorities. Magna Charta provided that the widow could remain in *"capitali messuagio"* for forty days after the husband's death, within which time dower should be assigned her. It would seem that there has been no change in England in the law relating to quarantine since Magna Charta. See the Laws of Eng. by the Earl of Halsbury, Vol. 24, p. 196.

In the year 1705 the General Assembly of Virginia passed the following statute: "And be it further enacted, That the widow of any person dying intestate, shall be endowed of one full and equal third part of all her deceased husband's lands, tenements, and other real estate, in manner as is directed and prescribed by the laws and constitutions of the kingdom of England: And till such dower shall be assigned, it shall be lawful for her to remain and continue in the Mansion house, and the messuage or plantation thereto belonging, without being chargeable to pay the heir any rent for the same: Any law, usage, or custom, to the contrary, in any wise, notwithstanding." See 3rd Henning's Statutes at Large, p. 374. This "enlargement of her common law quarantine" (*Carnall* v. *Wilson, supra,* p. 66) was retained without material change in a re-enactment in 1748. Henning, *supra,* Vol. 5, p. 448. It was legislatively classified with dower in 1785 under an act entitled "An act concerning the dower and jointures of widows." Henning, *supra,* Vol. 12, p. 162. It is included in chapter 94 of the acts of 1792 in an act entitled "An act to reduce into one, all acts and parts of acts relating to dower." I find no change in the statute until the Revised Code of 1849, which tersely stated that until dower was assigned, the widow "may hold, occupy and enjoy the mansion house and curtilage without charge." See sec. 8, Ch. 110. That right is repeated in the same language in the Virginia Code of 1860. It was incorporated *verbatim* in the West Virginia Code of 1868 as section 8, Chapter 65, the chapter being entitled "Of Dower, Jointure and Curtesy." It has been retained in our Code in the same phraseology and in the same setting ever since. See section 8, Chapter 65, Code 1923.

The purpose of the right is obvious. It is a humane provision assuring the widow a haven until her dower is assigned. For this reason it has been well termed "a statutory substitute for dower." *Shelton* v. *Carrol,* 16 Ala. 148, 153. It is also designed to "coerce" that assignment. *Simmons* v. *Lyle,* 32 Gratt. 752, 757. Professor Graves says the statute "puts a coal of fire on the terrapin's back". Notes on Real Property, section 313.

So we find that quarantine has been the immemorial handmaiden of dower; and for one hundred and fifty years it has been specifically recognized by the Legislatures of Virginia and West Virginia as "concerning", as "relating to", and as "of" dower. The right attaches only to dowable land and can be claimed only by a tenant in dower. 10 Am. & Eng. Ency. Law, p. 149; 2 Scribner, *supra*, chap. 3, sec. 5; *Holt* v. *Holt*, 96 W. Va. 337, 350. In *Minner* v. *Minner*, 84 W. Va. 679, 682, this Court declared that this right of a widow "supplements her right as life tenant". Therefore, while dower in its narrowest and most technical sense does not include quarantine, nevertheless quarantine is unquestionably *a dower right*. "The widow's quarantine, or right of possession * * * is an incident only to her dower, belonging to that right and inseparable from it." *Bleecker* v. *Hennion*, 23 N. J. Eq. 123; Reeves, *supra*, sec. 462.

The word "dower" as used in Magna Charta and as used in the Virginia and West Virginia statutes enlarging the widow's quarantine, relates exclusively to the life estate of the widow in the dowable real estate of her husband. *Hills Adm'rs.* v. *Mitchell*, 5 Ark. 608, 611. But the Legislature in 1921 certainly did not use the word "dower" in the narrow sense of 1200 A. D. Our law-makers undoubtedly had in mind dower amplified by statute, as it existed in 1921. The word as generally used is meant to include whatever provision the law makes for a widow out of the estate of her husband. "It is true that with the act of 1852 tenancies in dower were abolished, but even to this time, lawyers and courts have spoken of the provision for the widow, which is in lieu of that abolished, as 'dower'. Webster's International Dictionary defines 'dower' as 'the provision for a widow on her husband's death', and such is the plain or ordinary and usual sense in which it is employed." *Durbin* v. *Redman*, 140 Ind. 694, 696-7. "In many cases the word 'dower' is used in its popular rather than its technical sense. * * * An apt single word has not been coined to designate the interest which the widow takes in the estate of the deceased husband, and lawyers as well as laymen often speak of that interest as 'dower'. It is so used by courts of other states as well as our own."

*Larned* v. *Larned,* 98 Kan. 328, 334; *Daugherty* v. *Daugherty,* 69 Iowa 677, 678-9; Bacon's Abridgements, *supra,* 190; Bouvier's Law Dictionary, 3rd Rev., p. 932, *et seq.* Quarantine is a *provision* or *interest* given by law to the widow in her husband's estate. Quarantine is therefore included in the word "dower" when the latter is accorded its popular conception. It makes little difference, however, whether the relation of quarantine to dower be defined broadly or technically. If broadly, quarantine is a part of dower; if technically, it is a dower right. If it is a part of the dower estate, it becomes under the act of 1921 also a part of the estate in curtesy. If it is a dower right, it becomes also a curtesy right. Under either construction the defendant had the right to occupy the mansion house free of charge, and the ruling of the learned trial court on the item of rent is erroneous.

In 1925, Chapter 73, Acts 1921, was re-enacted, the words "in the same manner and under the same right as a widow would be entitled to dower" being omitted. Plaintiffs contend that the act of 1925 construes the act of 1921. The omission of the above phrase is patently an act of revocation and not one of construction.

The plaintiffs complain because, as they allege in their bill, the defendant's possession of the mansion house was exclusive. The right given by the statute to the widow to hold, *occupy and enjoy* the mansion house clearly signifies the right of exclusive possession. Under a statute no more favorable to the widow than our own, the Supreme Court of Alabama held: "The widow is entitled to the premises until her dower is assigned; she may reside on them, or lease them and receive rents; and neither the heir nor any one else who claims the inheritance or estate from the husband can defeat this right of the widow without having her dower assigned to her." *Inge* v. *Murphy,* 14 Ala. 289, 292. Accord: *McReynolds* v. *Counts,* 9 Gratt. (Va.) 242; *Doe* v. *Bernard,* 15 Miss. 319, 323-4; *Conger* v. *Atwood,* 28 Ohio St. 134, 22 Am. Rep. 362. Therefore we must hold that under the statute of 1921, the widower had the right to exclude the heirs from the mansion house.

In a decree entered in this cause on November 20, 1926, the defendant was adjudged entitled to an estate for life in one-third of all the real estate of his wife. In another decree entered February 15th, the commissioner was directed to state an account between the parties, taking into consideration as a part thereof fair rent for the mansion house. The plaintiffs say that either of the above decrees "settled the rights" of the defendant and were not appealed from within eight months. The first decree specifically relates to the life estate of the defendant and has no relation to *the tenancy-at-will* under which he held the mansion house. (Graves, *supra,* sec. 314.) The second decree was interlocutory and directory, and while made in preparation of the later adjudication that the defendant pay the rent, was not such an adjudication in itself.

Plaintiffs further complain because certain repairs to the mansion house amounting to $761.87 were charged to the estate instead of to the defendant. The items in question are for papering and painting the mansion house, repairing its roof, floors and plumbing, and for trimming the trees on its lot. Plaintiffs rely upon the absence of affirmative evidence that these repairs are permanent. There is testimony, however, that the building was in a bad state of repair. We cannot say that the repairs were not necessary to the proper use and preservation of the property. If necessary, as the allocation of the charges by the lower court indicates, the defendant was not personally liable. *Spinning* v. *Spinning,* 43 N. J. Eq. 215, 247.

Other objections are raised by plaintiffs to the procedure practiced by defendant in the circuit court, but we find them without merit.

The decree of the circuit court will accordingly be reversed in so far as it charges the defendant with the rent of the mansion house prior to the assignment of curtsey.

*Reversed and remanded.*